# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS
ESSEX SUPERIOR COURT

COPY

13- 620

| | |
|---|---|
| George J. Charest and Paula M. Charest | Civ. A. No. |
| Plaintiffs | |
| v. | Complaint and Jury Demand |
| Federal National Mortgage Association | |
| Defendant | |

## Nature of the Case

1. Plaintiffs George and Paula Charest, consumer homeowners, file this action against the investor who owns and directs the servicing of their mortgage, Federal National Mortgage Association, known as Fannie Mae. Over the course of approximately two years, Fannie Mae engaged in a pattern of unfair and deceptive business practices against the Charests related to the Charests' attempt to obtain a loan modification. Fannie Mae misrepresented the Charests' eligibility for a modification, miscalculated their income, promised them a modification that it never provided, repeatedly circumvented their counsel and contacted them directly, and scheduled foreclosure sales while they were under review for a modification. To resolve these claims, the Charests sent a demand letter, but Fannie Mae failed or refused to respond. The Charests now file this action for violation of the Consumer Protection Act, G.L. c. 93A.

## Parties

2.    Plaintiffs George and Paula Charest ("the Charests"), husband and wife, live
      in Groveland, Essex County, Massachusetts.

3.    Defendant Federal National Mortgage Association ("Fannie Mae") is a
      government-sponsored enterprise with its principal place of business in
      Washington, D.C. Fannie Mae is the investor who owns the Charests'
      mortgage, and who directs the mortgage servicing companies that
      administer the day-to-day servicing of the mortgage.

4.    At all relevant times, the Charests' mortgage was serviced by GMAC
      Mortgage, LLC ("GMAC"), on behalf of Fannie Mae and under Fannie
      Mae's direction and control. GMAC has filed for bankruptcy in the U.S.
      Bankruptcy Court for the Southern District of New York, case no. 12-
      12020.

5.    Because of GMAC's bankruptcy, borrowers such as the Charests are now
      generally prohibited from initiating actions against GMAC because of the
      automatic stay, pursuant to 11 U.S.C. § 362. Servicing of the Charests'
      mortgage was recently transferred to another mortgage servicer, Ocwen
      Loan Servicing, LLC, although Fannie Mae retains ownership and control
      of the servicing of the mortgage.

## Factual Background

### *The HAMP loan modification program*

6.  The Home Affordable Modification Program ("HAMP") was announced in early 2009. *See* Fannie Mae Announcement 09-05R, "Reissuance of the Introduction of the Home Affordable Modification Program" available at https://www.fanniemae.com/sf/guides/ssg/annltrs/pdf/2009/0905.pdf. The purpose of HAMP is to help millions of families modify and restructure their mortgage loans to avoid foreclosure. *Id.*

7.  HAMP accomplishes these loan modifications using a "uniform loan modification process to provide eligible borrowers with sustainable monthly payments." *Id.* The modified mortgage payment must be an amount equal to 31% of the borrower's gross monthly income. *Id.*

8.  The modification steps are called the "waterfall," and reduce the payment, inclusive of escrow for taxes and insurance, by: (1) capitalizing the arrears, resulting in a new principal balance comprised of the total amount due; (2) reducing the interest rate as low as 2%; (3) extending the term to a maximum of 40 years; and (4) providing a principal forbearance, i.e., making it so that the borrower does not have to pay interest on a portion of the principal balance. *Id.* at pp. 10–11.

9.      If, by performing these steps, the borrower's monthly mortgage payment can be reduced to 31% of the gross monthly income, the borrower is eligible for a loan modification. *Id.*

10.     HAMP also requires that the loan-modification process be administered in a way so as to comply with consumer protection laws, and requires that laws prohibiting unfair and deceptive business practices be complied with. *Id.* at p. 25.

*Fannie Mae's relationship with GMAC,*
*and GMAC's bankruptcy*

11.     The mortgage giant Fannie Mae is the investor that owns the Charests' loan. Fannie Mae is a government-sponsored enterprise chartered by Congress with a mission to provide liquidity, stability, and affordability to the U.S. housing and mortgage markets.

12.     Fannie Mae provides mortgage market liquidity by purchasing loans from mortgage originators so that those originators will have additional capital to lend to other borrowers. Because Fannie Mae commands a large share of the mortgage market, it is able to regulate how the loans it owns are serviced. It has established comprehensive regulatory guidelines prescribing how virtually every aspect of its mortgages must be handled by the mortgage servicers who administer the day-to-day communications with borrowers, collections, foreclosures, and loan modifications.

13.   These regulations, which are contained in the Fannie Mae Single-Family

Servicing Guide ("SSG"), are a matter of public record and available online

at https://www.efanniemae.com/sf/guides/ssg/. The SSG is also updated

regularly with announcements, letters, and notices. These are also available

online at https://www.efanniemae.com/sf/guides/ssg/.

14.   Pursuant to a contract with Fannie Mae, the prior servicer of the Charests'

mortgage, GMAC, serviced the Charests' mortgage. (Exhibit 1.)

15.   The SSG, along with the announcements, letters, and notices, are

incorporated by reference into Fannie Mae's contract with GMAC.

16.   At all relevant times, GMAC's actions were taken in connection with its

servicing duties under its contract with Fannie Mae.

17.   GMAC has subsequently filed for bankruptcy in the U.S. Bankruptcy Court

for the Southern District of New York, case no. 12-12020, and the servicing

of the Charests' mortgage was taken over by Ocwen Loan Servicing, LLC in

February 2013. The Charests's claims are only for Fannie Mae's actions

taken against the Charests during the period that GMAC serviced their

mortgage.

*Background on George and Paula Charest*

18.     The Charests purchased their home in 1978, over 35 years ago. They built the house themselves, and they raised their five children there. Mr. Charest is a veteran of the Vietnam War. The Charests live in the home with their daughter and grandchildren.

19.     When the Charests refinanced their mortgage in 2008, their credit score was approximately 706, which, as the lender stated in the application, was "excellent." The Charests only financed approximately $230,000, although the property value was approximately $445,000.

20.     Due to a number of unfortunate circumstances, the Charests fell behind on their mortgage. Mr. Charest had severe back problems as a result of spinal stenosis, and later had quadruple bypass surgery. Mrs. Charest had double knee surgery. Now, however, they are able to afford to resume reasonable mortgage payments under a loan modification.

21.     After the Charests fell behind on their mortgage in 2010, their mortgage servicer, GMAC, on behalf of Fannie Mae, solicited them, offering to consider them for a loan modification. This indicated to the Charests that Fannie Mae would consider their mortgage in good faith for this alternative to foreclosure.

22.     What happened since then, however, shows that Fannie Mae's offer of a loan modification was not in good faith because, over the next two years,

Fannie Mae and GMAC repeatedly and consistently committed unfair and deceptive business practices in connection with the Charests' loan-modification applications.

23.   Fannie Mae's actions included: misrepresenting the Charests' eligibility for a loan modification; miscalculating their income and falsely promising to provide a loan modification; falsely claiming that the Charests had not provided financial documents in support of their application, when in fact they had; scheduling foreclosure sales while the Charests' applications were under review; and directly contacting the Charests in violation of their request to be contacted through counsel.

### *The unfair and deceptive servicing of the Charests' mortgage*

24.   Fannie Mae's actions show a willful pattern of false and misleading statements, and unfair business practices. A bank that makes false and misleading statements in connection with a loan modification violates c. 93A. *See Okoye v. Bank of N.Y. Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *11 (D. Mass. July 28, 2011) (denying motion to dismiss because "it was in the process of those [loan modification] negotiations that [the bank] acted deceptively and unfairly by withholding and changing information, providing pretextual reasons for denying modification, and making misleading statements regarding the process and the state of the loan.").

25.    A bank violates c. 93A when it has engaged in "a pattern of

misrepresentations, failure to correct detrimental errors, and/or dilatory

conduct on the part of the servicer and/or bank that . . . could amount to

unfair or deceptive practices." *Id.* at *9. Here, as shown below, Fannie

Mae's actions show a pattern of false and misleading statements, pretextual

reasons for denying the Charests' loan-modification applications, and other

violations. GMAC violated c. 93A.

<u>Fannie Mae misrepresented the Charests'</u>
<u>eligibility for a loan modification.</u>

26.    In May 2011, GMAC, on behalf of Fannie Mae, falsely asserted that Fannie

Mae would not allow a principal forbearance as part of a loan modification.

27.    There was no such restriction, however, and the Fannie Mae guidelines did

and do allow for a forbearance. *See* Fannie Mae Announcement 09-05R, p.

11 ("If necessary, the servicer must provide for principal forbearance to

achieve the target monthly mortgage payment ratio").

28.    This false statement deprived the Charests of the opportunity to save their

home from foreclosure. When later challenged on this misstatement,

GMAC denied making it at all.

29.    Additionally, Fannie Mae unjustifiably denied the Charests' loan-

modification applications, submitted in or around December 2010 and

April 2011. Under the guidelines for HAMP, a borrower is eligible if his or

her monthly mortgage payment can be reduced to 31% of the borrower's

monthly gross income. In each case, the Charests were eligible for a modification.

30.    In the December 2010 application, the Charests' income was approximately $4,372. Fannie Mae could have reduced the monthly mortgage payment to 31% of this amount, $1,355, under HAMP guidelines. Fannie Mae, however, failed to do so, instead falsely stating that the Charests were not eligible for a loan modification.

31.    And in the April 2011 application, the Charests' income was approximately $3,713. Fannie could have reduced the monthly mortgage payment to $1,151, but again failed to do so, again falsely stating that the Charests were not eligible.

32.    Furthermore, as one of the bases of denying the Charests for a modification, Fannie Mae claimed that the Charests did not even live in the house, even though this was indisputably false, as the Charests have lived in their home continually since 1978.

33.    Fannie Mae's actions deprived the Charests of a loan modification that would have reduced their monthly mortgage payment, reduced the amount of interest paid over the life of the loan, and saved their home from further foreclosure proceedings.

**Fannie Mae intentionally miscalculated the Charests' income, and falsely promised to provide them with a loan modification.**

34. In July 2011, the Charests submitted a loan modification application. The application contained all the documentation required to evaluate them for a loan modification.

35. In response to the complete application, however, GMAC, on behalf of Fannie Mae, made repeated requests for information that had already been provided. For example, on July 15, 2011, it requested bank statements. GMAC then requested additional copies of the Charests' profit-and-loss statement and tax return on July 16, 2011, and again on July 26, 2011, even though these documents had already been provided.

36. Finally, in August 2011, Fannie Mae stated that the Charests' application had been denied due to having insufficient income. This was incorrect, as the Charests' income entitled them to a HAMP loan modification.

37. Instead of providing the Charests with a HAMP loan modification, which would have reduced their mortgage payment to an affordable level, Fannie Mae then offered the Charests an unaffordable "in-house" loan modification that actually *increased* their monthly payment by approximately $200 per month.

38. There was no way the Charests could have afforded an increased mortgage payment when they were already struggling with their current payment. This offer itself violated c. 93A because it was unaffordable. *See* 940 C.M.R.

8.06(15) (prohibiting offering a loan that the originator knows the borrower will be unable to afford to repay).

39. In response to this increased payment, the Charests asked for the amounts that Fannie Mae had calculated for their income. GMAC, on behalf of Fannie Mae, admitted that it had miscalculated the Charests' income, attributing $3,937 in gross income to Mrs. Charest alone, when in fact she only received only $1,750.

40. The Charests brought this error to Fannie Mae and GMAC's attention, and GMAC assured them that it would provide them with a new trial modification. Indeed, during repeated calls to check on the trial modification GMAC representatives assured the Charests that a new, correct payment was being calculated for them and would be sent to them.

41. The new modification never came. Instead, a few weeks later, GMAC informed the Charests that regardless of its own error, it would not provide them with the modification. It then resumed collection activity.

42. GMAC also informed the Charests that their debt-to-income ratio was too high. As a last-ditch effort to meet GMAC's demand to reduce the amount of their debt, the Charests filed for bankruptcy in January 2012. But even this did not satisfy GMAC and Fannie Mae, and Fannie Mae refused to provide a modification after the Charests filed for bankruptcy.

**Fannie Mae falsely claimed that the Charests did not provide**
**financial documents in support of their applications.**

43. As part of the loan-modification process, homeowners are required to
    provide financial documentation, such as pay stubs, bank statements, and
    financial forms. The Charests repeatedly provided the documentation that
    GMAC and Fannie Mae asked for. Nevertheless, GMAC made numerous
    false statements that the Charests did not provide the required
    documentation. This caused delays in processing the Charests' applications
    and caused the Charests to incur additional legal fees.

44. For instance, in December 2010, the Charests sent a complete loan-
    modification application. Then, in January, March, April, and May of 2011,
    GMAC requested additional documentation—documentation that had
    already been provided with the application. Ultimately, GMAC denied the
    loan modification, even though the Charests' income showed them to be
    qualified for one.

45. GMAC and Fannie Mae's only response was to ask the Charests to submit
    another application. So, on July 7, 2011, the Charests submitted another
    complete application. But on July 15, 2011, GMAC requested bank
    statements that had already been provided. Then on July 16, 2011, GMAC
    again requested a new package of financial information, even though the
    documentation had been provided. Ultimately, GMAC miscalculated the

Charests' income and denied this application, as well, even though the
Charests qualified for a HAMP loan modification.

**Fannie Mae scheduled foreclosure sales while the
Charests' applications were under review.**

46.     GMAC also scheduled foreclosure sales while the Charests were under
consideration for a loan modification, in violation of c. 93A. *See Kirtz v.
Wells Fargo Bank N.A.*, No. 12-10690-DJC, 2012 WL 5989705, at *13, Slip
Copy (D. Mass. Nov. 29, 2012) ("[plaintiff] has also alleged that Wells
Fargo scheduled a foreclosure while she was being considered for a loan
modification. Such conduct could also constitute an unfair or deceptive
practice.") (citing *Orozco v. GMAC Mortg., LLC*, No. 11-11135-FDS, 2012
WL 4581092, at *4 (D. Mass. Oct.1, 2012)).

47.     In fact, under the terms of the recent consent judgment against GMAC by
its federal regulator, it is prohibited from referring a homeowner's loan to
foreclosure while the homeowner is under review for a loan modification.
*See U.S. v. GMAC Mortgage, LLC, et al.*, No. 12-00361 (D. D.C. Apr. 4,
2012) (stating "If a borrower has not already been referred to foreclosure,
Servicer shall not refer an eligible borrower's account to foreclosure while
the borrower's complete application for any loan modification program is
pending") available online at https://d9klfgibkcquc.cloudfront.net/
Consent_Judgment_Ally-4-11-12.pdf.

48. Specifically, GMAC scheduled foreclosures on January 13, 2011, May 16, 2011, June 1, 2011, and January 19, 2012. At all of these times, the Charests were under review for a loan modification.

### Fannie Mae directly contacted the Charests in violation of their request to be contacted through counsel.

49. A creditor is prohibited from directly contacting a consumer who has requested that all communication go through his or her attorney. *See* G.L. c. 93, § 49 ("collection or attempt to collect shall be deemed unfair, deceptive or unreasonable if . . . The creditor communicates directly with the alleged debtor after notification from an attorney representing such debtor that all further communications relative to the debt should be addressed to him.").

50. On November 30, 2010, the Charests requested that all communications be directed to their attorney. GMAC and Fannie Mae acknowledged receiving this request on December 10, 2010, sending a letter to them stating "we updated our records to reflect you are represented by counsel."

51. Nevertheless, GMAC persisted in sending communications directly to the Charests, including but not limited to letters in January, February, and March of 2010. By sending these letters in violation of the request to cease contact, GMAC and Fannie Mae violated G.L. c. 93, § 49, which is a per se violation of c. 93A.

**Count I:**
**Consumer Protection Act, G.L. c. 93A**

52.    The preceding paragraphs are hereby incorporated by reference.

53.    The Charests are consumer homeowners who are not engaged in trade or commerce with respect to the issues in this complaint.

54.    Fannie Mae is engaged in trade or commerce in Massachusetts by owning mortgages in Massachusetts, servicing mortgages, reviewing homeowners such as the Charests for loan modifications, and foreclosing.

55.    Fannie Mae engaged in unfair and deceptive acts and practices with respect to the Charests, as described throughout this complaint.

56.    The Charests sent demand Fannie Mae on March 4, 2013 pursuant to G.L. c. 93A, describing their damage and asking for a settlement offer. (**Exhibit 2.**)

57.    Fannie Mae failed to make any settlement offer in response to the Charests' demand.

58.    The Charests have been damaged in that their right to have their mortgage serviced fairly was violated. They lost the benefit of a loan modification, which would have reduced their mortgage payment, and allowed them to keep their home. They also incurred thousands of dollars in costs and attorney fees.

## Request for Relief

**WHEREFORE**, the Charests request the following relief:

a) Judgment in their favor and against Fannie Mae on all counts;

b) Actual and compensatory damages, treble damages, costs, interest, and attorney fees;

c) An order that Fannie Mae evaluate the Charests for, and provide them with, a loan modification; and

d) All other relief available at law or in equity.

## Jury Demand

The Charests demand a trial by jury on all issues so triable.

Respectfully submitted,

Josef C. Culik (BBO #672665)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
Tel. (617) 830-1795
Fax (617) 830-1576
jculik@culiklaw.com

Attorney for Plaintiffs
George J. Charest and Paula M. Charest

April 17, 2013

16

# Exhibit 1

 **FannieMae**

# Mortgage Selling and Servicing Contract
### Instructions to the Lender

The Mortgage Selling and Servicing Contract ("Contract") establishes the Lender's (defined below on Page 1 of the Contract) contractual relationship with Fannie Mae, and sets forth the terms and conditions for the Lender to sell mortgages to Fannie Mae, and service such mortgages on Fannie Mae's behalf. The Lender's application package must include two signed originals of the Contract. Upon approval of the Lender's application, Fannie Mae will insert any additional types of approval granted in Section XVI.B on page 21 of the Contract, and return one fully executed original Contract to the Lender for the Lender's permanent records.

Once the terms and conditions of the Contract have been read and understood by the Lender, the Lender should complete the "signature page" on page 22, as follows:

- Complete all fields above the line "Federal National Mortgage Association ("Fannie Mae")".

- On the line beginning with "Lender:" enter the Lender's full legal name, which should also match the name entered on the application form.

- Have two copies of the Contract signed by an authorized officer of the Lender. Such officer should also be listed as a principal of the Lender on the Authorization for Verification of Credit and Business References (Form 1001).

7/2005



# Mortgage Selling and Servicing Contract

7/2005

**FannieMae**

# Contract

**Mortgage
Selling And
Servicing
Contract**

| | | |
|---|---|---|
| I | General Information | 1 |
| II | Eligibility Requirements For Lenders | 2 |
| III | Sale Of Mortgages And Participation Interests | 3 |
| IV | Sale Of Mortgages And Participation Interests – Lender's Warranties | 4 |
| V | Servicing Mortgages | 8 |
| VI | Assignment, Consideration And Continuance | 10 |
| VII | Assigning Mortgage Servicing | 11 |
| VIII | Breaches Of Contract | 11 |
| IX | Termination Of Contract | 14 |
| X | Continuance Of Responsibilities Or Liabilities | 17 |
| XI | Participation Interests – Special Provisions | 18 |
| XII | Notice | 20 |
| XIII | Prior Agreements | 21 |
| XIV | Severability And Enforcement | 21 |
| XV | Captions | 21 |
| XVI | Scope Of Contract | 21 |
| XVII | Signatures And Date | 22 |

 **FannieMae**

# Contract

**Mortgage Selling And Servicing Contract**

This contract for selling and servicing mortgages ("Contract") is between the Mortgage Lender ("Lender") that signs this document and the Federal National Mortgage Association ("Fannie Mae", "we", "our", "us"), a corporation organized and existing under the laws of the United States

## I   General Information

This section contains important basic information about this Contract, which we are permitted to enter into under authority of Title III of the National Housing Act (12 U S C 1716, *et seq*), which is also known as the Federal National Mortgage Association Charter Act

**A. Purpose Of Contract**

The purpose of this Contract is

- to establish the Lender as an approved seller of mortgages and participation interests to us,

- to provide the terms and conditions of the sales,

- to establish the Lender as an approved servicer of mortgages we have purchased or in which we have purchased a participation interest, and

- to provide the terms and conditions of servicing.

**B. Consideration**

In consideration of the purpose of this Contract and of all the provisions and mutual promises contained in it, the Lender and Fannie Mae agree to all that this Contract contains

**C. Our Guides**

We issue Fannie Mae's Guides to Lenders (our "Guides") and furnish them to the Lender. These Guides are:

- Selling,
- Servicing, and
- Multifamily.

Whenever there is a reference to the Guides in this Contract, it means the Guides as they exist now and as they may be amended or supplemented in writing. We may amend or supplement them, at our sole discretion, by furnishing amendments or supplementary matter to the Lender

The term "Guides" also includes anything that, in whole or in part, supersedes or is substituted for the Guides

**D. Important Definitions**

Anywhere the words that appear below are used in this Contract, the following definitions apply

1. **"Mortgage"** – A loan, evidenced by a note, bond or other instrument of indebtedness. The loan is secured by a mortgage, deed of trust, deed to secure debt or other instrument of security that applies to property  "Mortgage" includes such instruments of indebtedness and security, together with

- the evidence of title,
- the chattel mortgage or security agreement and financing statement, and
- all other documents, instruments and papers pertaining to the loan.

 **FannieMae**

# Contract

2. "FHA/VA Mortgage" - A mortgage insured or guaranteed in whole or in part by the Federal Housing Administration or Veterans Administration.

3. "Conventional Mortgage" - A mortgage other than an FHA/VA mortgage, which Fannie Mae is authorized to purchase under the Federal National Mortgage Association Charter Act.

4. "Property" or "Mortgaged Property" - The property that is now subject to a mortgage, or was subject to such mortgage, where the mortgage has been foreclosed or possession or title to the property has been taken by Fannie Mae or on our behalf

5. "Participation Interest" or "Participation Interest in Mortgages" - An undivided interest in mortgages, specified in the applicable participation certificate that is evidence of such interest. A "participation interest" or "participation interest in mortgages" consists of a specified percentage of the principal (and a like percentage of all rights and benefits of the mortgagee or equivalent party under such mortgage) together with a specified yield on it

## II   Eligibility Requirements For Lenders

For us to purchase mortgages or participation interests from a Lender, the Lender must meet the eligibility requirements specified in this section.

**A**
**General**
**Requirements**

These are the general requirements the Lender must meet to be eligible to sell us mortgages or participation interests or service mortgages for us-

1. **Meet Fannie Mae Standards.** The Lender must have as two of its principal business purposes

- making mortgages of the type that we will purchase entirely or purchase a participation interest in under this Contract, and
- servicing such mortgages.

In addition, the Lender, in our judgment, must have at all times the capacity to originate and sell to us mortgages and participation interests that meet our purchase standards and the standards generally imposed by private institutional mortgage investors, and must at all times have the capacity to service such mortgages for us under those standards.

2 **Have Qualified Staff And Adequate Facilities.** The Lender must, at all times, have employees who are well trained and qualified to perform the functions required of the Lender under this Contract.

In addition, the Lender must maintain facilities that are adequate to perform its functions under this Contract

3 **Maintain Fidelity Bonds And Errors And Omissions Coverage.** The Lender must maintain, at its own expense, a fidelity bond and errors and omissions insurance, as required by our Guides

4 **Report Basic Changes.** The Lender must notify us promptly in writing of any changes that occur in its principal purpose, activities, staffing or facilities


**FannieMae**

# Contract

**B.**
**Ownership And**
**Status Of Lender**

When we approve a lender, one of the major considerations is the information such lender has provided about the eligibility, qualifications and financial status of the lender and its owners

Consequently, the Lender must give us immediate notice of a change in its status or ownership, including any

- sale or transfer of a majority interest in it,
- merger;
- consolidation; or
- change in legal structure

**C.**
**Finances**

In order to remain an approved lender under this Contract, the Lender must meet our current net worth requirements   These requirements are contained in our Guides.

The required net worth must be maintained in the form of assets acceptable to us

The Lender must give us a copy of its annual financial statements and any other related information that we may require

**D.**
**Access To**
**Lender's Records**

The Lender agrees to permit our employees or designated representatives to examine or audit records or accounts relating to mortgages or participation interests sold or serviced under this Contract  All records relative to the Lender's continued eligibility to sell or service mortgages or participation interests under this Contract may also be examined or audited  Any examination or audit made on our behalf will be conducted during regular business hours unless the Lender agrees otherwise

## III    Sale Of Mortgages And Participation Interests

This section contains the basic rules governing our purchase of mortgages and participation interests.

**A.**
**What Governs**
**Purchases**

Purchases of mortgages and participation interests will be governed by.

- our written commitment to purchase,
- our Guides, including all amendments in effect on the day we make our written commitment, and
- this Contract.

**B.**
**What We**
**Purchase**

The mortgages or participation interests that we purchase must meet the requirements found in our Guides on the day we make our written commitment.

**C.**
**Lender's Obligation**
**To Purchase**
**Fannie Mae Stock**
**D**
**Fannie Mae Has**
**No Obligation**
**To Purchase**

If our Guides require, the Lender will promptly purchase our common stock each time it delivers a mortgage or participation interest to us. The amount of stock to be purchased and the procedures for buying it are also found in our Guides

The fact that we have signed this Contract does not mean that we must make a commitment to purchase any mortgage or participation interest from the Lender

 **FannieMae**

# Contract

## IV   Sale Of Mortgages And Participation Interests – Lender's Warranties

The Lender makes certain warranties to us

These warranties

- apply to each mortgage sold to us in its entirety;
- apply to each mortgage in which a participation interest is sold to us,
- are made as of the date transfer is made to us,
- continue after the purchase of the mortgage or participation interest,
- continue after payment by us of the purchase price to the Lender, and
- are for our benefit as well as the benefit of our successors and assigns.

Warranties may be waived, but only by us in writing.

**A.
Specific
Warranties**

Following are the specific warranties made by the Lender

**1. Mortgage Meets Requirements.** The mortgage conforms to all the applicable requirements in our Guides and this Contract.

**2. Lender Authorized To Do Business**  The Lender and any other party that held the mortgage were, at all times during which the holder held the mortgage, authorized to transact business in the jurisdiction where the property is located

However, if the Lender or any other party that held the mortgage was not authorized to do business in the jurisdiction where the property is located, then the warranty is made that none of the following activities of the Lender or other parties constituted doing business in that jurisdiction

- lending the mortgage funds,
- acquiring the mortgage;
- holding the mortgage, or
- transferring the mortgage in whole or to the extent of a participation interest

**3  Lender Has Full Right To Sell And Assign.** The Lender is the sole owner and holder of the mortgage and has full right and authority to sell and assign it, or a participation interest in it, to us  In addition, the Lender's right to sell or assign is not subject to any other party's interest or to an agreement with any other party

**4  Lender's Lien On Property.** The mortgage, whether represented by the Lender as the first lien or as the second lien, is a valid and subsisting lien on the property described in it.

If the mortgage is represented by the Lender as the first lien, the property is free and clear of all encumbrances and liens having priority over it except for liens for real estate taxes, and liens for special assessments, that are not yet due and payable.

 **FannieMae**

# Contract

If the mortgage is represented by the Lender as the second lien, the property is free and clear of all encumbrances and liens having priority over it except for one properly recorded first mortgage lien, and real estate taxes and liens of special assessments, not yet due and payable

Any security agreement, chattel mortgage or equivalent document that is related to the mortgage and that is held by the Lender or delivered to us, is a valid and subsisting lien on the property described in such document, of the same priority as the mortgage

The Lender has full right and authority to sell or assign each lien to us or to an extent that is proportionate to our participation interest.

**5 Documents Are Valid And Enforceable.** The mortgage and any security agreements, chattel mortgages, or equivalent documents relating to it have been properly signed, are valid, and their terms may be enforced by us, our successors and assigns, subject only to bankruptcy laws, Soldiers' and Sailors' Relief Acts, laws relating to administering decedents' estate, and general principles of equity

**6 Property Not Subject To Liens.** The Property is free and clear of all mechanics' liens, materialmen's liens or similar types of liens There are no rights outstanding that could result in any of such liens being imposed on the property

This warranty is not made if the Lender furnishes us with title insurance that gives us substantially the same protection as this warranty.

**7 Title Insurance.** There is a mortgage title insurance policy, or other title evidence acceptable to us, on the property. The title insurance policy is on a current ALTA form (or other generally acceptable form) issued by a generally acceptable insurance company

The title insurance insures (or the other title evidence protects) us or the Lender and its successors and assigns, as holding a lien of the priority warranted in "4 Lender's Lien On Property."

**8 Modification Or Subordination Of Mortgage.** The Lender has not done any of the following:

- materially modified the mortgage;

- satisfied or cancelled the mortgage in whole or in part;

- subordinated the mortgage in whole or in part, unless it is represented to us as a second mortgage;

- released the property in whole or in part from the mortgage lien, or

- signed any release, cancellation, modification or satisfaction of the mortgage

This warranty is not made if any of the things just mentioned have been done but have been expressly brought to our attention in a letter before we make payment to the Lender The letter must be acknowledged by us in writing

 **FannieMae**

# Contract

9  **Mortgage In Good Standing.** There are no defaults under the mortgage, and all of the following that have become due and payable have been paid or an escrow of funds sufficient to pay them has been established

* taxes;
* government assessments;
* insurance premiums;
* water, sewer and municipal charges;
* leasehold payments, or
* ground rents.

10. **Advances.** The Lender has not made or knowingly received from others, any direct or indirect advance of funds in connection with the loan transaction on behalf of the borrower except as provided in our Guides  This warranty does not cover payment of interest from the earlier of·

* the date of the mortgage note;
* the date on which the mortgage proceeds were disbursed to the borrower; or
* the date one month before the first installment of principal and interest on the mortgage is due

11. **Property Conforms To Zoning Laws.** The Lender has no knowledge that any improvement to the property is in violation of any applicable zoning law or regulation.

12. **Property Intact.** The property is not damaged by fire, wind or other cause of loss  There are no proceedings pending for the partial or total condemnation of the property.

13. **Improvements.** Any improvements that are included in the appraised value of the property are totally within the property's boundaries and building restriction lines  No improvements on adjoining property encroach on the mortgaged property unless FHA or VA regulations or our Guides permit such an encroachment.

14  **Mortgage Not Usurious**  The mortgage is not usurious and either meets or is exempt from any usury laws or regulations.

15. **Compliance With Consumer Protection Laws**  The Lender has complied with any applicable federal or state laws, regulations or other requirements on consumer credit, equal credit opportunity and truth-in-lending

16. **Property Is Insured.** A casualty insurance policy on the property is in effect  It is written by a generally acceptable insurance company and provides fire and extended coverages for an amount at least equal to the amount required by our Guides

 **FannieMae**

# Contract

A flood insurance policy is in effect on the property if any part of it is in an area listed in the Federal Register by the Federal Emergency Management Agency as an area with special flood hazards, and if insurance is available. The flood insurance is written by a generally acceptable insurance company, meets current guidelines of the Federal Insurance Administration, and is for an amount at least equal to the amount required by our Guides

The Lender will make sure the required insurance is maintained as long as it services the mortgage. Any policy mentioned in this warranty contains a standard mortgage clause that names us or the Lender and its successors and assigns as mortgagee.

**17. Mortgage Is Acceptable Investment.** The Lender knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to

- cause private institutional investors to regard the mortgage as an unacceptable investment,
- cause the mortgage to become delinquent; or
- adversely affect the mortgage's value or marketability

**18  Mortgage Insurance Or Guaranty Is In Force.** If the Lender represents that the mortgage is insured or guaranteed under the National Housing Act as amended, or under the Servicemen's Readjustment Act of 1944 as amended, or by a contract with a mortgage insurance company, the insurance or guaranty is in full force. In addition, the Lender has complied with all applicable provisions and related regulations of the Act, or the insurance contract, that covers the mortgage

**19. Adjustable Mortgages.** If the mortgage provides that the interest rate or the principal balance of the mortgage may be adjusted, all of the terms of the mortgage may be enforced by us, our successors and assigns

These adjustments will not affect the priority of the lien warranted in "4  Lender's Lien On Property "

**20  Participation Information Is Correct.** All the information and statements in any participation certificate that the Lender delivers to us are complete, correct and true.

**B.
Consequences Of
Untrue Warranties
- Repurchase**

We may require the Lender to repurchase a mortgage or participation interest sold to us if any warranty made by the Lender about the mortgage or participation interest is untrue (whether the warranty is in this Contract or was made at our specific request).

We may require repurchase whether or not the Lender had actual knowledge of the untruth  We may also enforce any other available remedy

The Lender must pay us the repurchase price within 30 days of our demand  The repurchase price, as provided in our Guides, will not be adjusted because the Lender paid us fees or charges or subscribed to our capital stock

**FannieMae**

# Contract

**C.**
**Consequences**
**Of Untrue Warranties**
**- Termination**
**Of Contract**

While untrue warranties about a particular mortgage or participation interest may be the basis for requiring repurchase of the particular mortgage or participation interest, there can be additional consequences They may also give rise to responsibilities of the Lender under "D. Indemnification For Breach Of Warranty, Holding Us Harmless." In addition, untrue warranties can, under certain circumstances, be treated as a breach of contract that could result in the withdrawal of our approval of a Lender and the termination of this Contract (details are contained in Sections VIII and IX).

**D.**
**Indemnification**
**For Breach Of**
**Warranty;**
**Holding Us Harmless**

If there is a breach of warranty under this Contract, the Lender, at our request, will indemnify us and hold us harmless against any related losses, damages, judgments or legal expenses

## V   Servicing Mortgages

This section contains the basic rules governing the servicing of mortgages that we purchase, or in which we purchase a participation interest

**A**
**Servicing Duties**
**Of The Lender**

The servicing duties of the Lender are

1   Scope Of Duties. The Lender will diligently perform all duties that are necessary or incident to the servicing of·

- all mortgages it is servicing for us on the date this Contract takes effect; and

- all other mortgages that the Lender is required to service by the terms of this Contract or any other existing or future agreement between us and the Lender.

2   Mortgages To Be Serviced. Any mortgage we have purchased from the Lender, or in which we have purchased a participation interest from the Lender, will be serviced by the Lender for us according to the terms of this Contract, unless·

- the mortgage is not within any category of those that are required by our Guide to be serviced, or

- we give the Lender written notification or consent that a mortgage to be purchased by us will not be serviced by the Lender

3   Service According To Guides  Any mortgage serviced under this Contract, which we own or in which we have purchased a participation interest, must be serviced by the Lender according to the provisions in our Guides that are in effect on the date of this Contract or as amended in the future.  This is true regardless of when

- the mortgage was originated;

- the mortgage or a participation interest in it was transferred to us, or

- the Lender began servicing the mortgage

The Lender will also follow other reasonable instructions we give it and must strictly follow accepted industry standards when servicing a mortgage for us.

 **FannieMae**

## Contract

4   **Service At Lender's Own Expense.** The cost of servicing will be the Lender's unless our Guides expressly provide otherwise

5   **Special Responsibilities In Foreclosures.** Among the other duties that may be assigned to the Lender through our special instructions or under the terms of our Guides is the responsibility to manage and appropriately dispose of property when a mortgage it is servicing for us has been foreclosed, or possession or title has been taken by us or on our behalf

The Lender must manage and dispose of the property according to the terms of the mortgage and our Guides

6   **Service Until Need Ends.** The Lender must service each mortgage continuously from the date its servicing duties begin until:

- the mortgage's principal and interest have been paid in full,

- the mortgage has been liquidated and the mortgaged property properly disposed of (if the Lender is required to do these things); or

- the Lender's servicing duties are terminated according to Section IX of this Contract.

**B. Compensation**

The Lender's compensation for servicing mortgages, including the management and disposal of properties, under this Contract is specified in our Guides

We may change the Lender's compensation by modifying our Guides at any time However, such a change will not affect mortgages that we have purchased or committed to purchase before the date of the change

**C. Ownership Of Records**

All mortgage records reasonably required to document or properly service any mortgage we own in its entirety are our property at all times. This is true whether or not the Lender developed or originated them

The following are considered mortgage records.
- all mortgage documents;
- tax receipts,
- insurance policies,
- insurance premium receipts;
- ledger sheets,
- payment records,
- insurance claim files and correspondence,
- foreclosure files and correspondence,
- current and historical data files, and
- all other papers and records.



# Contract

1. **Lender As Custodian.** The mortgage records belong to us. The Lender can have possession of the mortgage records only with our approval, and the Lender is acting as our custodian. This is true whether the Lender receives the mortgage records from an outside source or prepares them itself.

2. **Delivery.** When we ask for any mortgage records in writing, the Lender will deliver them to us or someone we choose. The Lender must also send us a list that identifies each mortgage, and must give us other information we request to identify the mortgages delivered.

We will not be required to sign or deliver any trust receipts before the Lender delivers the mortgage records we have requested.

If we ask the Lender in writing for reproductions of any mortgage records the Lender microfilmed or condensed, the Lender will reproduce them promptly at no cost to us or the party to whom we want them delivered.

3. **Joint Ownership.** If we own a participation interest in a mortgage, the other owners and we own the mortgage records jointly. For these mortgages, the Lender possesses the mortgage records as a custodian for the joint owners.

If we ask for copies of the mortgage records and servicing information about any such mortgages, the Lender will furnish them. Or, if we need any mortgage records for legal evidence or other purposes, the Lender will release them to us for a reasonable time.

**D.**
**Agreement To**
**Indemnify And**
**Hold Harmless**

The Lender will indemnify us and hold us harmless against all losses, damages, judgments or legal expenses that result from its failure in any way to perform its services and duties in connection with servicing mortgages or managing or disposing of property according to this Contract or our Guides.

If any private entity or governmental agency sues us, makes a claim against us or starts a proceeding against us based on the Lender's acts or omissions in servicing mortgages or managing or disposing of property, the Lender's obligation to indemnify and hold us harmless must be met regardless of whether the suit, claim or proceeding has merit or not.

The Lender's obligation does not apply, however, if during a suit, claim or proceeding, we give the Lender express written instructions and as a result of the Lender following them we suffer losses, damages, judgments or legal expenses.

**E.**
**Ownership Of**
**Our Stock**

If our Guides require, the Lender will continuously own our common stock in connection with all mortgages it services under this Contract. The amount of stock to be owned will be established by our Guides as they were in existence on the date the Lender started servicing the applicable mortgages.

# VI  Assignment, Consideration And Continuance

This section describes our requirements covering assignment of, consideration for and continuance of this Contract.

 **FannieMae**

# Contract

**A.**
**Assignment**

Because the relationships created by this Contract are personal, the Lender may not, without our prior written approval, assign:

- this Contract under any circumstances, either voluntarily or involuntarily, by operation of law, or otherwise; or

- its responsibility for servicing individual mortgages we own or in which we have a participation interest

(See Section VII of this Contract for required procedures governing assignments of servicing.)

**B.**
**Limited Value**
**Of Contract**
**To Lender**

The Lender acknowledges that it has paid us no monetary consideration for making it an approved mortgage seller or servicer, except an application fee to reimburse us for the expenses of reviewing its application.

The Lender also agrees that, except for the purchase of mortgages, the purchase of participation interests, the servicing of mortgages, or any fee for the termination of this Contract, this Contract has no value to the Lender

**C.**
**Requirements**
**For Continuance**

The Lender's right to continue selling and servicing mortgages under this Contract depends on, among other things, its continuing to meet the eligibility requirements in Section II of this Contract.

## VII    Assigning Mortgage Servicing

The Lender may not assign its responsibility for servicing all or any part of the mortgages that it is servicing for us without first obtaining our written consent

Any Lender to which servicing is assigned must:
- be acceptable to us, and
- sign a Mortgage Selling and Servicing Contract with us

We may require that the Lender and transferee lender sign documents and take other reasonable steps to perfect the assignment

## VIII    Breaches Of Contract

The Lender's taking certain actions, or failing to take certain actions, can be treated by us as a breach of contract  A breach of contract can lead to a termination of this Contract. Termination is provided for in detail in Section IX

**A.**
**Specific**
**Breaches Of**
**Contract**

Breaches of this Contract include the following.

1. **Harm, Damage, Loss Or Untrue Warranties.** It is a breach if any act or omission of the Lender in connection with the origination and sale to us of any mortgage or participation interest causes us harm, damage or loss. It is also a breach if the Lender sells us any mortgage or participation interest knowing that any of the mortgage warranties are untrue (these warranties are listed in Section IV A)



# Contract

**2  Failure To Comply With This Contract Or Our Guides.** It is a breach if the Lender does not comply with this Contract or our Guides through any act or omission, including, without limitation, the following:

- failure to establish and maintain accounts for our funds or mortgagors' funds as required by our Guides;

- use of our or mortgagors' funds in any manner other than that permitted by our Guides, including the Lender's failure to deposit all mortgage funds if, when, and to the extent required by our Guides;

- failure to remit all funds due to us within the time periods required by our Guides,

- failure to make or ensure, according to the provisions of each mortgage or of applicable laws or regulations, proper and timely payment of all·

  - taxes;

  - assessments;

  - leasehold payments,

  - ground rents,

  - insurance premiums (including premiums of casualty, liability and mortgage insurance and other forms of required insurance);

  - required interest on escrow funds; and

  - other required payments with respect to any mortgage (including mortgaged property) serviced,

  unless the Lender is relieved of these responsibilities by the express provisions of our Guides, or by our written instructions that relate to a particular mortgage or property,

- failure to renew or ensure renewal of any required insurance policy on any mortgage (including mortgaged property) serviced under this Contract,

- failure to maintain adequate and accurate accounting records and mortgage servicing records for the mortgages, or to maintain proper identification of the applicable loan files and mortgage records that prove our outstanding participation interests;

- failure to submit adequate and accurate accounting and mortgage servicing reports within the time required by our Guides; or

- failure to take prompt and diligent action under applicable law or regulation to collect past due sums on mortgages, or to take any other diligent action described in our Guides that we reasonably require for mortgages in default

 **FannieMae**

# Contract

**3. Failure To Properly Foreclose Or Liquidate.** Where a mortgage is in default and the Lender is required or has decided to foreclose or liquidate it, it is a breach if the Lender fails to take prompt and diligent action consistent with applicable law or regulations to foreclose on or otherwise appropriately liquidate such mortgage and to perform all incident actions. It is a breach whether or not the failure results from the acts or omissions of an attorney, trustee or other person or entity the Lender chooses to effect foreclosure or liquidation.

**4 Failure To Properly Manage, Dispose Of, Or Effect Proper Conveyance Of Title.** It is a breach if any mortgage serviced under this Contract has been foreclosed or the possession or title to the property has been taken by us or on our behalf, or on behalf of other owners of a participation interest in the mortgage, and the Lender:

- fails to properly manage, dispose of or effect proper conveyance of title to the mortgaged property; or

- fails to do the above in accordance with this Contract, our Guides, and any pertinent laws, regulations, or mortgage insurance policies or contracts.

**5 Lender's Financial Ability Impaired.** It is a breach if there is a change in the Lender's financial status that, in our opinion, materially and adversely affects the Lender's ability to satisfactorily service mortgages.

Changes of this type include.
- the Lender's insolvency;
- adjudication of the Lender as a bankrupt,
- appointment of a receiver for the Lender; or
- the Lender's execution of a general assignment for the benefit of its creditors

If any such change does take place·

- no interest in this Contract will be considered an asset or liability of the Lender or of its successors or assigns; and

- no interest in this Contract will pass by operation of law without our consent

**6. Failure To Obtain Our Prior Written Consent.** It is a breach if the Lender fails to obtain our prior written consent for:
- a sale of the majority interest in the Lender, or
- a change in its corporate status or structure.

**7. Failure To Comply With This Contract Or Our Guides.** It is a breach if the Lender fails at any time to meet our standards for eligible mortgage sellers or servicers so that, in our opinion, the Lender's ability to comply with this Contract or our Guides is adversely affected



# Contract

8. **Court Findings Against Lender Or Principal Officers.** It is a breach if:

- a court of competent jurisdiction finds that the Lender or any of its principal officers has committed an act of civil fraud, or

- the Lender or any of its principal officers is convicted of any criminal act related to the Lender's lending or mortgage selling or servicing activities or that, in our opinion, adversely affects the Lender's reputation or our reputation or interests.

**B. Actions To Correct A Breach**

If there is a breach of this Contract by the Lender, we will have the right to take any reasonable action to have any breach corrected by the Lender before we exercise any right we have to terminate this Contract in whole or in part; however, we are not required to try to have a breach corrected before termination

Any forbearance by us in exercising our right to terminate this Contract in whole or in part will not be a waiver of any present or future right we have under this Contract to so terminate it

## IX   Termination Of Contract

The reason why this Contract may be terminated and the ways in which this may be done are outlined in this section. When this Contract is terminated, the entire relationship between the Lender and us ends (with certain exceptions that are explained in this section).

**A. Termination By Either Party Of Mortgage Selling Arrangements**

The provisions of this Contract covering the sale of mortgages or participation interests under this Contract may be terminated by the Lender or by us, with or without cause, by giving notice to the other party. Notice of termination may be given at any time but must conform to Section XII of this Contract.

Termination is effective immediately upon notice of termination, unless the notice specifies later termination.

Termination will not affect any outstanding commitments we have made to purchase mortgages or participation interests from the Lender. However, if the Lender has breached this Contract, we may declare any or all outstanding commitments void

**B. Termination By Lender Of Mortgage Servicing Arrangements For Wholly-Owned Mortgages**

The Lender may terminate the provisions of this Contract covering the servicing of mortgages we entirely own by giving us notice at any time. Notice must conform to Section XII of this Contract

Termination is effective the last day of the third calendar month after the calendar month in which notice is given

If the Lender terminates this Contract in whole or in part, we will not pay the Lender a termination fee



# Contract

**C. Termination By Us Of Servicing Arrangements For Wholly-Owned Mortgages**

We may terminate the provisions of this Contract covering the servicing under this Contract of any or all mortgages that we entirely own. This may be done by following the procedures outlined below

**1  Termination Without Cause**  We may terminate servicing for any reason, by giving the Lender notice of the termination. If we do so, the provisions of this Contract covering the servicing of the affected mortgages will automatically terminate on the thirtieth day following the day our notice is given. Whenever we do this (and the termination is not because of any breach by the Lender as described in Section IX C 2) we will pay the Lender, for each mortgage on which servicing is terminated, a lump-sum termination fee as provided in *a* below. However, whenever we terminate solely in order to transfer the servicing to another Lender, and there has been no sale of our interest in the affected mortgages, the provisions of *b* below will apply.

*a  Termination Fee*  The termination fee will be an amount equal to twice the Lender's annualized servicing compensation, at the rate of compensation that is in effect for the mortgage as of the date of the termination, applied against the unpaid principal balance of the mortgage as of such date

For purposes of determining the termination fee.

- the Lender's servicing compensation consists of the servicing fee at the Applicable Servicing Rate plus any previously agreed upon excess yield that the Lender is permitted to retain on the applicable mortgage; and

- "Applicable Servicing Rate" means the rate of the servicing fee for the servicing of the mortgage, expressed as an annualized fractional percentage

(Refer to appropriate sections of our Guides for more detailed information regarding the computation of termination fees.)

*b. Termination To Effect Transfer*  Whenever we terminate servicing solely in order to transfer servicing of the mortgages to another Lender, and there has been no sale of our interest in the mortgages, we will give the Lender notice of the required transfer. Within the 90-day period immediately following the date our notice is given, the Lender may arrange for the sale of the servicing to another Fannie Mae-approved lender in good standing that, in our judgment, will properly service the mortgages to be transferred Within that 90-day period, the Lender will give notice of any proposed sale to us, together with all related information The sale of servicing is conditioned upon our approval, which will not be unreasonably withheld Any resulting transfer of servicing will be completed not later than 60 days after our approval of the transfer, and

- the Lender will be entitled to the proceeds of the sale of servicing, and will bear all costs and expenses related to the sale and transfer of servicing,

- the Lender will not pay us a transfer fee,

- we will not pay the Lender a termination fee,



# Contract

- we may require the purchaser of the servicing to assume any or all warranties that were made to us in connection with the sale to us of the affected mortgages, and

- the purchaser of the servicing will succeed to the Lender's obligations, rights and servicing compensation, under the provisions of this Contract covering the servicing of the affected mortgages. For all of the affected mortgages that we purchased under a net-yield contract, the servicing compensation will include the specified minimum servicing fee, plus the Lender's share of that portion of the yield which exceeds the stated net yield, as provided under the commitment contract.

(Refer to appropriate sections of our Guides for more detailed information regarding the computation of the Lender's servicing compensation.)

If at the end of the 90-day period following our notice, the Lender has not arranged to sell and transfer the servicing of the affected mortgages to another lender acceptable to us and given us the required notice, the provisions of this Contract covering the servicing of the mortgages will automatically terminate on the fifteenth day following the end of the 90-day period, and we will transfer the servicing to a lender of our choice. In such a case, we will pay the Lender, for each mortgage on which servicing is terminated, a termination fee computed as provided under *a* above. We will deduct from the termination fee paid to the Lender a transfer fee that is the greater of $500.00 or 1/100 of 1% of the aggregate unpaid principal balance of all of the affected mortgages on which servicing is transferred.

*c General Criteria For Termination Fees* Notwithstanding anything to the contrary in this Contract, we may change the amount of termination fee that we pay, or other provisions of this Section IX C 1, from time to time, by changing the appropriate provisions of our Guides. However, such a change will not affect mortgages that we have purchased or that we have committed to purchase before the date of the change.

Our written tender of the termination fee to the Lender, or its successors or assigns, is complete compensation for each mortgage serviced by the Lender on which servicing is terminated. Any sums we owe the Lender for servicing prior to the termination date are not included in the termination fee. When we pay a termination fee, the Lender will not be entitled to the proceeds for any sale of the servicing involved.

2 *Termination With Cause.* We may terminate if the Lender breaches any agreement in this Contract, including, without limitation, any of those breaches listed in Section VIII A. This may be done by giving the Lender notice of termination. Notwithstanding anything in this Contract to the contrary, if we terminate for breach, we may make it effective immediately, and we will not pay the Lender a termination fee or proceeds from any sale of the servicing involved. Furthermore, we will not pay a servicing termination fee if a mortgage is repurchased by the Lender because a warranty is untrue.

 **FannieMae**

# Contract

**D.
Termination
By Us Of
Servicing
Arrangements
For Mortgages
In Which We
Have A
Participation
Interest**

If the Lender breaches any agreement in this Contract, including, without limitation, any breach listed in Section VIII A, we may terminate the provisions of this Contract covering the servicing of any or all mortgages in which we own a participation interest This may be done by giving notice of termination  Such termination may be effective immediately, and we will not pay the Lender a termination fee

1  Transfer Of Lender's Powers. Upon termination, we will automatically succeed to all the Lender's rights in and responsibilities for servicing of the affected mortgages. We will also have the option to exercise all the Lender's powers relating to these mortgages, and to designate any person or firm to exercise those powers. However, exercise of the Lender's powers must be consistent with the Lender's and our respective participation interests.

The mortgage instruments for these mortgages and all related mortgage records will be delivered to us or a party we designate  The Lender will also deliver necessary assignments, transfers and documents of authority

2. Transfer Of Servicing. If we terminate the Lender's servicing of any such mortgages, we are authorized to transfer the servicing of the mortgages to new servicers and pay the new servicers a fee  The fee will apply to the total outstanding principal balance on each mortgage, including our participation interest in each mortgage as well as the participation interest of the Lender and of any other owner

3. Liability For Fees. The Lender and all additional owners of a participation interest will be liable for their respective shares of the servicing fee we pay. They will also be liable for their respective shares of advances that, in our sole discretion, are required Advances may be required for insurance, taxes, maintenance, improvements or other necessary outlays.

If the Lender or other owners fail to promptly provide their share of funds for advances, or for any other necessary expenses, during any period, we may supply the funds  The fact that we do this does not release the Lender or other owners from their liability  We may deduct any amount we advance the next time we owe money to the Lender or other owners

**E.
Rights Of
Termination
Not Impaired**

The exercise of a right of termination under any provision of this Contract will not impair any further right of termination under another provision

## X   Continuance Of Responsibilities Or Liabilities

Responsibilities or liabilities of the Lender that exist before the termination of this Contract will continue to exist after termination unless we expressly release the Lender from any of them in writing  This is true whether this Contract was terminated by the Lender or by us

 **FannieMae**

# Contract

## XI   Participation Interests – Special Provisions

This section contains special provisions that govern participation interests

**A.
After The
Sale Of A
Participation
Interest**

Listed below are the consequences of the sale of a participation interest

1   **Transfer Of Undivided Interest.** When the Lender sells and conveys to us a participation interest in one or more mortgages, this is a transfer of an undivided interest in each mortgage

The sale and conveyance of the participation interest will have the same force and effect as

- a separate assignment of each mortgage executed and delivered to us by the Lender, and

- a promissory note separately endorsed or transferred to us

2   **Assurance Of Our Legal Rights.** If federal or state laws or regulations now, or later, provide that the purchase of a participation interest is an extension of credit, the Lender will take whatever additional steps we may require to assure our legal rights as a purchaser of participation interests.

Such steps may include

- placing legends on promissory notes;

- endorsing promissory notes in blank and delivering them to us; and

- executing mortgage assignments in a form acceptable to us and delivering them to us

3   **No Partnership Or Joint Venture.** Neither the simultaneous ownership of interests in one or more mortgages nor any provision of this Contract will mean that a partnership or joint venture exists between the Lender and us

**B.
Payments To Us**

The Lender will make the following payments to us, according to our Guides, for mortgages in which both the Lender and we own an interest·

1   **Ratable Sharing Of Principal.** The Lender will ratably share with us all mortgage principal payments.

2   **Participation Share Of Interest.** The Lender will pay us our participation share of interest payments up to

- an amount sufficient for us to earn our yield on each mortgage, plus

- any amounts due us pursuant to this section

**C.
Enforcement Of
Due-On-Sale
And Call Options**

As required by our Guides, the Lender will enforce the due-on-sale provisions and call options in the mortgages it services for us.

 **FannieMae**

# Contract

**D.
Repurchase
Option**

The Lender will have the option to repurchase our interest in a mortgage if

- the Lender is required by our Guides to enforce a due-on-sale clause of a mortgage in which the Lender and we own an interest; or

- we elect to exercise a call option provision of such a mortgage

If the Lender wishes to repurchase our interest in such a mortgage, it may do so by

- giving us notice of its intention to repurchase, and

- paying us an amount calculated according to the provisions of our Guides

**E.
Note Rate Increase,
Foreclosure
Expenses And
Prepayment Charges**

The note rate of a mortgage is stated in the participation certificate or attached loan schedule.

**1. Note Rate Increase.** If, for any reason, there is an increase of the note rate of a mortgage in which we hold a participation interest, the Lender will pay us, according to our Guides, a percentage of the increase equal to the percentage represented by our participation interest in the mortgage. This amount will be in addition to our yield on the mortgage.

**2. Foreclosure Expenses.** The Lender will ratably share with us any reasonable foreclosure and related expenses in connection with a mortgage in which we own a participation interest

**3. Prepayment Charges.** The Lender will ratably share with us any prepayment charges collected for mortgages in which we own a participation interest.

**F.
Advances**

The Lender will not make any optional or voluntary advances to the borrower under an open-end mortgage in which we own a participation interest.

**G.
Assignment
Or Sale Of
Participation
Interests**

Participation interests may be assigned either by the Lender or us, as follows:

1   **By Us.** Without the Lender's consent we may assign:

- our participation interest in any mortgage; and

- all rights in the mortgage we own under this Contract or under any other instruments.

2   **By Lender To Transferee.** The Lender may sell or transfer all or part of any participation interest that it owns in any mortgage under this Contract unless expressly prohibited from doing so by our Guides

This sale or transfer of participation interests is subject to the conditions below, as well as to our Guides as they are in effect on the date of our commitment to purchase.

For every sale or transfer, the Lender must obtain and furnish us with a properly executed instrument by which the transferee·

- agrees to be bound by the terms of this Contract; and

- acknowledges our rights and interests under this Contract with respect to the mortgage

# FannieMae

## Contract

Our rights and interests that must be acknowledged include, without limitation, the right to assess a servicing fee against the owner of each participation interest if we-

- assume the servicing of the mortgage, or
- transfer the servicing to a new servicer under Section IX D of this Contract

The sale or transfer of a participation interest does not relieve the Lender of any responsibility or liability under this Contract. For example, the Lender continues to be liable for any fees and other amounts charged under Section IX D 3 of this Contract against the participation interest that is transferred. We may collect these amounts from the Lender or from the transferee.

3. By Lender To Bank. The Lender may be a member of, or be required to maintain reserves with, a Federal Home Loan Bank or Federal Reserve Bank. If so, and the Lender transfers its participation interests in any mortgage under this Contract to such a bank to secure one or more advances, then the bank will not be deemed to have assumed the mortgage warranties found in Section IV A.

Also, such a transfer to the bank will not relieve the Lender of any responsibility or liability under this Contract

**XII   Notice**

Whenever notice is required under this Contract, it must be given as described in this section

**A.**
**Notice Of**
**Termination**

Any notice of termination given under this Contract must be-

- in writing;
- delivered in person or sent by registered or certified mail, with a return receipt requested; and
- addressed to the party to which notice is being given

Delivery and notice is given when we or the Lender mail or register the notice with any post office.

**B.**
**Our Guides**
**And Other**
**Documents**

Our Guides, including any amendments or supplements, and any other notices, demands or requests under this Contract or applicable law will be.

- in writing;
- delivered in person or mailed from any post office, substation, or letter box,
- enclosed in a postage prepaid envelope, and
- addressed to the Lender

**C.**
**Address**

For purposes of notice, the following rules apply

1  Our address is the address of our regional office given in this Contract

2  The Lender's address is that of its principal place of business given in this Contract

Any change of address must be given in writing.

 **FannieMae**

# Contract

## XIII    Prior Agreements

This Contract supersedes any prior agreements between the Lender and us that govern selling or servicing of mortgages and participation interests to which this Contract relates

However, this section will not release the Lender from any responsibility or liability under any prior agreements and understandings.

## XIV    Severability And Enforcement

If any provision of this Contract conflicts with applicable law, the other provisions of this Contract that can be carried out without the conflicting provision will not be affected

All rights and remedies under this Contract are distinct and cumulative not only as to each other but as to any rights or remedies afforded by law or equity   They may be exercised together, separately or successively   These rights and remedies are for our benefit and that of our successors and assigns

## XV    Captions

This Contract's captions and headings are for convenience only and are not part of this Contract.

## XVI    Scope Of Contract

The following provisions apply, whether or not they are contrary to other provisions in this Contract.

**A.
Restriction
Of Lender**

We reserve the right to restrict the Lender's sale or servicing of mortgages or of participation interests to the type that the Lender and its employees have the experience and ability to originate, sell or service.

**B.
Types Of
Mortgages
Covered**

This Contract covers only the sale of mortgages and participation interests and the servicing of mortgages, within the following categories:

```
Seller and Servicer of one- to four-family first
and second lien mortgages, Cooperative Mortgages
and Rehabilitations.
```

 **FannieMae**

## Contract

**XVII    Signatures And Date**

By executing this Contract, the Lender and Fannie Mae agree to all of this Contract's terms and provisions. Both the Lender and Fannie Mae have signed and dated this Contract below

This Contract takes effect on the date of execution by Fannie Mae.

Lender   *GMAC Mortgage, LLC*

*100 Witmer Road*
(Address)

*Horsham PA 19044*

By   *[signature]*
     *Barry Bier*        (Authorized Signature)
     *Executive Vice President*
                  (Type Name and Title)
Date  *7-13-06*

Federal National Mortgage Association ("Fannie Mae")

One South Wacker Drive
(Address)

Suite 1400

Chicago, Illinois  60606

By   *[signature]*
              (Authorized Signature)
     Bruce Honaker, Assistant Vice President
AUG – 9 2006  (Type Name and Title)
Date

# Exhibit 2

# CULIK LAW PC

Champion Your Rights.®

18 COMMERCE WAY, SUITE 2850
WOBURN, MASSACHUSETTS 01801

P  (617) 830 1795
F  (617) 830 1576

culiklaw.com

March 4, 2013

VIA CERTIFIED MAIL

Certified Article Number

7196 9008 9040 1536 6352

SENDERS RECORD

GMAC Mortgage, LLC
James Whitlinger, Manager
1100 Virginia Dr.
Fort Washington, PA 19034

Federal National Mortgage Association
Timothy J. Mayopoulos, President
3900 Wisconsin Ave., NW
Washington, DC 20016

Re:    Demand for Offer of Settlement

Messrs. Whitlinger and Mayopoulos:

This is a demand for an offer of settlement on behalf of my clients George and
Paula Charest of 55 Center Street, Groveland, Massachusetts 01834 pursuant to
the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 9 ("ch.
93A"). The basis of this demand is GMAC and Fannie Mae's unfair and deceptive
servicing of the Charests' mortgage account, loan no. 0601960414.

As you know, GMAC services the account on behalf of Fannie Mae, making
Fannie Mae responsible under the principles of agency for all actions committed
by GMAC.

## A.  Background

The Charests purchased their home in 1978, over 35 years ago. They built the
house themselves, and they raised their five children there. Mr. Charest is a

veteran of the Vietnam War. The Charests live in the home with their daughter and grandchildren. When the Charests refinanced their mortgage in 2008, their credit score was 706, which, as GMAC stated in the application, was "excellent." The Charests only financed $300,000, although the property value was $445,000.

Due to a number of unfortunate circumstances, the Charests fell behind on their mortgage. Mr. Charest had severe back problems as a result of spinal stenosis, and later had quadruple bypass surgery. Mrs. Charest had double knee surgery. They are, however, able to afford to resume reasonable mortgage payments under a loan modification.

After the Charests fell behind on their mortgage in 2010, GMAC solicited them, offering to consider them for a loan modification. This indicated to the Charests that GMAC would consider their mortgage in good faith for this alternative to foreclosure.

What happened since then, however, shows that GMAC's offer of a loan modification was not in good faith because, over the next two years, GMAC repeatedly and consistently committed unfair and deceptive business practices in connection with the Charests' loan-modification applications. GMAC's actions included: misrepresenting the Charests' eligibility for a loan modification; miscalculating their income and falsely promising to provide a loan modification; falsely claiming that the Charests had not provided financial documents in support of their application, when in fact they had; scheduling foreclosure sales while the Charests' applications were under review; and directly contacting the Charests in violation of their request to be contacted through counsel.

## B. The HAMP loan-modification program.

The Home Affordable Modification Program ("HAMP") was announced in April 2009. *See* Fannie Mae Ann. 09-05R. The purpose of HAMP was to help millions of families modify and restructure their mortgage loans to avoid foreclosure. *Id.* HAMP accomplishes these loan modifications using a "uniform loan modification process to provide eligible borrowers with sustainable monthly payments." *Id.* The modified mortgage payment must be an amount equal to 31% of the borrower's gross monthly income. *Id.* The modification steps are called the "waterfall," and reduce the payment, inclusive of escrow for taxes and insurance, by: (1) capitalizing the arrears, resulting in a new principal balance comprised of the total amount due; (2) reducing the interest rate as low as 2%; (3) extending the term to

a maximum of 40 years; and (4) providing a principal forbearance, i.e., making it so that the borrower does not have to pay interest on a portion of the principal balance. *Id.* at pp. 10–11. If, by performing these steps, the borrower's monthly mortgage payment can be reduced to 31% of the gross monthly income, the borrower is eligible for a loan modification. *Id.*

## C. GMAC's unfair and deceptive servicing of the Charests' mortgage.

As explained below, GMAC's actions show a willful pattern of false and misleading statements, and unfair business practices. A bank that makes false and misleading statements in connection with a loan modification violates ch. 93A. *See Okoye v. Bank of N.Y. Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *11 (D. Mass. July 28, 2011) (denying motion to dismiss because "it was in the process of those [loan modification] negotiations that [the bank] acted deceptively and unfairly by withholding and changing information, providing pretextual reasons for denying modification, and making misleading statements regarding the process and the state of the loan."). A bank violates ch. 93A when it has engaged in "a pattern of misrepresentations, failure to correct detrimental errors, and/or dilatory conduct on the part of the servicer and/or bank that . . . could amount to unfair or deceptive practices." *Id.* at *9. Here, GMAC's actions show a pattern of false and misleading statements, pretextual reasons for denying the Charests' loan-modification applications, and other violations. GMAC violated ch. 93A.

### 1. GMAC misrepresented the Charests' eligibility for a loan modification.

In May 2011, GMAC falsely asserted that the investor who owns the Charests' mortgage, Fannie Mae, would not allow a principal forbearance as part of a loan modification. There was no such restriction, however, and the Fannie Mae guidelines did and do allow for a forbearance. *See* Fannie Mae Ann. 09-05R, p. 11 ("If necessary, the servicer must provide for principal forbearance to achieve the target monthly mortgage payment ratio"). GMAC's false statement deprived the Charests of the opportunity to save their home from foreclosure. When challenged on this misstatement, GMAC denied making the statement at all.

Additionally, GMAC unjustifiably denied the Charests' loan-modification applications, submitted in or around December 2010 and April 2011. Under the guidelines for HAMP, a borrower is eligible if his or her monthly mortgage payment can be reduced to 31% of the borrower's monthly gross income. In each

case, the Charests were eligible for a modification. In the December 2010 application, the Charests' income was approximately $4,372. GMAC could have reduced the monthly mortgage payment to 31% of this amount, $1,355, under HAMP guidelines. GMAC, however, failed to do so, instead falsely stating that the Charests were not eligible for a loan modification.

And in the April 2011 application, the Charests' income was approximately $3,713. GMAC could have reduced the monthly mortgage payment to $1,151, but again failed to do so, again falsely stating that the Charests were not eligible.

Furthermore, as one of the bases of denying the Charests for a modification, GMAC claimed that the Charests did not even live in the house, even though this was indisputably false. As mentioned above, the Charests have lived in their home continually since 1978.

GMAC's actions deprived the Charests of a loan modification that would have reduced their monthly mortgage payment, reduced the amount of interest paid over the life of the loan, and saved their home from further foreclosure proceedings.

### 2. GMAC willfully miscalculated the Charests' income, and falsely promised to provide them with a loan modification.

In July 2011, the Charests submitted a loan modification application to GMAC. The application contained all the documentation required to evaluate them for a loan modification.

In response to the complete application, however, GMAC made repeated requests for information that had already been provided. For example, on July 15, 2011, GMAC requested bank statements. GMAC then requested additional copies of the Charests' profit-and-loss statement and tax return on July 16, 2011, and again on July 26, 2011, even though these documents had already been provided.

Finally, in August 2011, GMAC stated that the Charests' application had been denied due to having insufficient income. This was incorrect, as the Charests' income entitled them to a HAMP loan modification.

Instead of providing the Charests with a HAMP loan modification—which would have reduced their mortgage payment to an affordable level—GMAC then offered

the Charests an "in-house" loan modification that actually increased their monthly payment by approximately $200 per month. There was no way the Charests could have afforded an increased mortgage payment when they were already struggling with their current payment. This offer itself violated ch. 93A because it was unaffordable. *See* 940 C.M.R. 8.06(15) (prohibiting offering a loan that the originator knows the borrower will be unable to afford to repay).

In response to this increased payment, the Charests asked for the amounts that GMAC had calculated for their income. GMAC admitted that it had miscalculated the Charests' income, attributing $3,937 in gross income to Mrs. Charest alone, when in fact she only received only $1,750. The Charests brought this error to GMAC's attention, and GMAC assured them that it would provide them with a new trial modification. Indeed, during repeated calls to check on the trial modification GMAC representatives assured the Charests that a new payment was being calculated for them.

The new modification never came. Instead, a few weeks later, GMAC informed the Charests that regardless of its own error, it would not provide them with the modification. It then resumed collection activity.

GMAC also informed the Charests that their debt-to-income ratio was too high. As a last-ditch effort to meet GMAC's demand to reduce the amount of their debt, the Charests filed for bankruptcy in January 2012. But even this did not satisfy GMAC, and GMAC refused to provide a modification after the Charests filed for bankruptcy.

### 3. GMAC falsely claimed that the Charests did not provide financial documents in support of their applications.

As part of the loan-modification process, homeowners are required to provide financial documentation, such as pay stubs, bank statements, and financial forms. The Charests repeatedly provided the documentation that GMAC asked for. Nevertheless, GMAC made numerous false statements that the Charests did not provide the required documentation. This caused delays in processing the Charests' applications and caused the Charests to incur additional legal fees.

For instance, in December 2010, the Charests sent GMAC a complete loan-modification application. Then, in January, March, April, and May of 2011, GMAC requested additional documentation—documentation that had already been

provided with the application. Ultimately, GMAC denied the loan modification, even though the Charests' income showed them to be qualified for one.

GMAC's only response was to ask the Charests to submit another application. So, on July 7, 2011, the Charests submitted another complete application. But on July 15, 2011, GMAC requested bank statements that had already been provided. Then on July 16, 2011, GMAC again requested a new package of financial information, even though the documentation had been provided. Ultimately, GMAC miscalculated the Charests' income and denied this application, as well, even though the Charests qualified for a HAMP loan modification.

### 4. GMAC scheduled foreclosure sales while the Charests' applications were under review.

GMAC also scheduled foreclosure sales while the Charests were under consideration for a loan modification, in violation of ch. 93A. *See Kirtz v. Wells Fargo Bank N.A.*, No. 12-10690-DJC, 2012 WL 5989705, at *13, Slip Copy (D. Mass. Nov. 29, 2012) ("[plaintiff] has also alleged that Wells Fargo scheduled a foreclosure while she was being considered for a loan modification. Such conduct could also constitute an unfair or deceptive practice.") (citing *Orozco v. GMAC Mortg., LLC*, No. 11-11135-FDS, 2012 WL 4581092, at *4 (D. Mass. Oct.1, 2012)). In fact, under the terms of the recent consent judgment against GMAC,[1] it is prohibited from referring a homeowner's loan to foreclosure while the homeowner is under review for a loan modification. Specifically, GMAC scheduled foreclosures on January 13, 2011, May 16, 2011, June 1, 2011, and January 19, 2012. At these times, the Charests were under review for a loan modification. GMAC violated ch. 93A by doing so.

### 5. GMAC directly contacted the Charests in violation of their request to be contacted through counsel.

A creditor is prohibited from directly contacting a consumer who has requested that all communication go through his or her attorney. *See* Mass. Gen. Laws ch.

---

[1] *U.S. v. GMAC Mortgage, LLC, et al.*, No. 12-00361 (D. D.C. Apr. 4, 2012) (stating "If a borrower has not already been referred to foreclosure, Servicer shall not refer an eligible borrower's account to foreclosure while the borrower's complete application for any loan modification program is pending") available at https://d9klfgibkcquc.cloudfront.net/Consent_Judgment_Ally-4-11-12.pdf.

93, § 49 ("collection or attempt to collect shall be deemed unfair, deceptive or unreasonable if . . . The creditor communicates directly with the alleged debtor after notification from an attorney representing such debtor that all further communications relative to the debt should be addressed to him.").

On November 30, 2010, the Charests requested that all communications be directed to their attorney. GMAC acknowledged receiving this request on December 10, 2010, sending a letter to them stating "we updated our records to reflect you are represented by counsel."

Nevertheless, GMAC persisted in sending communications directly to the Charests, including but not limited to letters in January, February, and March of 2010. By sending these letters in violation of the request to cease contact, GMAC violation Mass. Gen. Laws. ch. 93, § 49. These actions are per se violations of ch. 93A, § 49.

## D. Conclusion

The Charests were damaged by GMAC's above actions. Their right to have their mortgage serviced fairly was violated. *See* 209 C.M.R. 18.21 (prohibiting unfair and deceptive mortgage servicing). They lost the benefit of a loan modification, which would have reduced their mortgage payment, and allowed them to keep their home. They also incurred thousands of dollars in costs and attorney fees.

This demand puts your organizations on notice that you must make a reasonable inquiry into these allegations, and that when you confirm them, you make a reasonable settlement offer. *See Whelihan v. Markowski*, 37 Mass. App. Ct. 209, 214, 638 N.E.2d 927 (1994) ("There is no requirement that a demand letter be accompanied by documentation or other proof of the assertions therein made.").

Please note that the Charests have no obligation to make a demand for a specific monetary amount. *Leardi v. Brown*, 394 Mass. 151 (1985); *Tarpey v. Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct. 380 (1999). Rather, what is required is what is presented here, a written demand for relief. Mass. Gen. Laws ch. 93A, § 9(3).

This demand does not make any demand inconsistent with the order authorizing limited relief from the automatic stay in GMAC's bankruptcy proceeding. *See* Supplemental Order for Interim Relief, *In re: Residential Capital, LLC, et al.*, Docket #391, No. 12-12020 (Bankr. S.D. N.Y. June 5, 2012).

7

Therefore, I demand that your organizations make a reasonable settlement offer consistent with your obligation under ch. 93A.

Very truly yours,

Josef C. Culik
Attorney at Law

cc:     George and Paula Charest
        Thomas J. Cunningham, Esq. (via email)
        Richard Wentz, Esq. (via email)

8

 **UNITED STATES POSTAL SERVICE.**

**Date Produced: 03/11/2013**


**WALZ CERTIFIED MAIL SOLUTIONS LLC**


The following is the delivery information for Certified Mail™ item number 7196 9008 9040
1536 6352. Our records indicate that this item was delivered on 03/07/2013 at 12:16 p.m. in
WASHINGTON, DC, 20016. The scanned image of the recipient information is provided
below.

Signature of Recipient:


Address of Recipient:


Thank you for selecting the Postal Service for your mailing needs.  If you require additional
assistance, please contact your local post office or Postal Service representative.

Sincerely,


United States Postal Service

U..S. EM EP13F OCT 2008

Visit us at usps.com

We Deliver!



## UNITED STATES POSTAL SERVICE

### Click-N-Ship®

**E**

usps.com
$18.11
US POSTAGE
Flat Rate Env

9481 7036 9930 0002 2543 81 0181 1001 0102 0016

04/24/13

**Commercial Base Pricing**
Mailed from 01801   052S0000001311

## USPS EXPRESS MAIL®

KRISTIN THURBIDE
CULIK LAW PC
18 COMMERCE WAY
STE 2850
WOBURN MA 01801-1056

Ref#: Charest

**0007**

NO DELIVERY SUNDAY/HOLIDAY

SHIP
TO:

TIMOTHY J MAYOPOULOS, PRESIDENT
FEDERAL NATIONAL MORTGAGE ASSOCIATION
3900 WISCONSIN AVE NW
WASHINGTON DC 20016-2806

## USPS EXPRESS MAIL

**420 20016 9481 7036 9930 0002 2543 81**

### POSTAL USE ONLY

| Date In: Mo. 4 | Day 24 | Year | Time In: | ☐ AM ☐ PM |
|---|---|---|---|---|
| **Day of Delivery:** ☐ Next | | ☐ Second | ☐ 12 Noon | ☐ 3 PM |
| Return Receipt | COD | | Additional Insurance Fee | $0.00 |

Timothy  Mayopoulos

OFFICE·CUBE:
1545>1H-123

SENDER:   PO#:
mail services-dc

04-25-2013 12:07pm

SQBX0000698677



## UNITED STATES POSTAL SERVICE

# EXPRESS MAIL

Visit us at usps.com

## Flat Rate Mailing Envelope

### For Domestic and International Use

PLEASE PRESS FIRMLY

Print postage online - Go to usps.com/postageonline

PLEASE PRESS FIRMLY

ENVELOPE
POSTAGE REQUIRED

When used internationally affix customs declarations (PS Form 2976, or 2976A).

EXPRESS MAIL


Recycled Paper

Please recycle.

USPS packaging products have been awarded Cradle to Cradle Certification for their ecologically-intelligent design. For more information go to mbdc.com/usps.
Made in Cradle to Cradle. Cradle to Cradle is a certification mark of MBDC.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Express Mail® shipments.
Misuse may be a violation of federal law . This packaging is not for resale. EP13F © U.S. Postal Service; Oct. 2008; All rights reserved.

04-25-13P12:50 RCVD
*Nancy Mack*



(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:*   (TORT) - MOTOR VEHICLE TORT -
CONTRACT   -   EQUITABLE RELIEF   -   OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. *13-620*

*George J. Charest and Paula M. Charest* , Plaintiff(s)

v.

*Federal National Mortgage Association* , Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon *Josef Culik, Culik Law, PC* ,

plaintiff's attorney, whose address is *18 Commercial Way, Suite 2850, Woburn MA 01801* , an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

*145 High Street*
*Newburyport MA 01950* either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

WITNESS, BARBARA J. ROUSE , Esquire, at Salem, the

day of , in the year of our Lord two thousand

*Thomas H. Driscoll Jr.*

Clerk

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

# EXHIBIT B

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT | DOCKET NO. _____ |
|---|---|---|
| | COUNTY OF   **ESSEX** | |

| PLAINTIFF(S)   George J. Charest and Paula M. Charest | DEFENDANT(S)   Federal National Mortgage Association |
|---|---|

**Type Plaintiff's Attorney name, Address, City/State/Zip Phone Number and BBO#**

Josef C. Culik (BBO #672665)
Culik Law PC
18 Commerce Way, Suite 2850
Woburn, MA 01801
(617) 830-1795

**Type Defendant's Attorney Name, Address, City/State/Zip Phone Number (If Known)**

---

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

CODE NO.        TYPE OF ACTION (specify)        TRACK                    **IS THIS A JURY CASE?**

A99 Other (specify ) - Fast Track                                        ⦿ ] Yes   ○ ] No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
**(Attach additional sheets as necessary)**

A. Documented medical expenses to date:
   1.  Total hospital expenses                                          $_____
   2.  Total doctor expenses                                           $_____
   3.  Total chiropractic expenses                                     $_____
   4.  Total physical therapy expenses                                 $_____
   5.  Total other expenses (describe)                                 $_____
                            Subtotal  $_____
B. Documented lost wages and compensation to date                     $_____
C. Documented property damages to date                                $_____
D. Reasonably anticipated future medical expenses                     $_____
E. Reasonably anticipated lost wages and compensation to date         $_____
F. Other documented items of damages (describe)                       $_____

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                       Total $_____

**CONTRACT CLAIMS**
**(Attach additional sheets as necessary)**

Provide a detailed description of claim(s):

Unfair and deceptive mortgage servicing, in violation of G.L. c. 93A        **TOTAL**   $100,000

**PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT**

N/A

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____          Date:   Apr 17, 2013

A.O.S.C. 3-2007